First case we have this morning is number 12-3067, Mankodi v. Trump Marina Associates LLC et al., Mr. Nersessian and Donnelly. Good morning, Your Honors. May it please the Court, Robert Nersessian for Appellant Previn Mankodi. I would reserve five minutes for rebuttal. Thank you. The case before you, as defendant has termed it, is one of the interminable reoccurrences of card counters trying to gain rights. Your Honor, that's not this case. As this started off, your primary – I guess Mr. Mankodi's primary complaint was, look, you had a contract, and they breached the contract, the card that he was dealt. They then sort of changed the game in the middle. But how do we even have – doesn't the Gaming Control Commission have exclusive control over that because it deals with how you operate a particular casino? No, Your Honor. In fact, there is absolutely no private right of redress nor ability for Mr. Mankodi to approach the Casino Control Commission for any relief whatsoever. And this was recognized by the New Jersey Supreme Court in the case of Campione v. Atomar, where they stated and made it clear that the courts are not – the courts are not ousted from jurisdiction over common law damage claims arising from gaming transactions. And that's what this is. This is not some complex regulatory scheme. Never in the history – the entire game of blackjack does not authorize anybody to stop the game once it starts. Before the court are the common law citations for what a gaming contract is. And the main premise, the core of any wagering agreement is that you complete the game. But if you look – look, the Casino Control Commission has – the Supreme Court has said you have no private cause of action even though the casino made a mistake in terminating the game when your client was dealt an ace. If we – if we agree with the Supreme Court and we are bound by state law in this diversity case, the only cause of action you have left, if we agree with the Supreme Court, and I do, is that you have a battery, you have a false imprisonment, and you have a public accommodations for damages. Now let me ask you, what damages do you actually have – I'm speaking about medical, psychological, or other proof of actual damages that he has suffered which a jury could reasonably conclude were $75,000? Your Honor, first, as a precursor, I'm curious, the New Jersey Supreme Court has stated that there is no private cause of action. There's no private cause of action. Terminating the game. The New Jersey Supreme Court has stated in Camp Young in 1998 that any time that you – the Gaming Control Commission has exclusive jurisdiction over the interpretation and enforcement of regulations. Yes. And that's what this involves. But Judge Cowen has correctly said, okay, even if you do there, we're talking about a minimal sum, the only way that – because the max you could get would be, what, if you put down $3,700 and some dollars, you can get $7,400. So your claim, your way to get to $75,000 diversity jurisdiction, which is what you need to get to, can only arise under your claims one, two, and four. And he just listed them, the battery, the false imprisonment, et cetera. Yes. How do you get there? Your Honor, you get there through the testimony of Previn Mancotti at trial with the jury. What does that testimony add to the damages that he has suffered? What medical proof do you have? None. What other proof do you have of damages that he has suffered which could reasonably go to $75,000? None. None. None in the form of medical proof. What I have is Previn Mancotti's testimony. What I have is what Buckley versus – the New Jersey Supreme Court stated in Buckley versus Trenton and Decker versus Princeton packet. When you have physical contact, the test for emotional distress damages does not require medical proof. You go off of the proofs at trial, which here will be Mr. Mancotti's testimony, which we have had no opportunity to present. What is that testimony going to be? The testimony will be that he was incredibly shaken up, that he was afraid for his life when he was taken to that back room because people have been historically – we see movies, the movie 21, the movie Casino. That back room is not a nice place, and that is the place where people have their perceptions of what the back room of a casino is. And Mr. Mancotti was indisputably taken there, and the jury should be entitled to hear this testimony about what that is. Your Honors, we have presented a slew of authority for analogous cases that geometrically exceed, on just the testimony of the plaintiff, the threshold amount here. You haven't cited one New Jersey case in which a $75,000 verdict could accumulate from the common law torts other than civil rights cases, which are in another category. But there's nothing – and this is a New Jersey cause of action. You haven't cited one case where there's been a verdict of that dimension coming out of a New Jersey court. Campione was a verdict of that dimension. Yeah, but that – what, the old lady and so forth, that was – this is a different type of situation. No, Campione was a seven-figure verdict for malicious prosecution. We have – That's not the cause of action here. He wasn't prosecuted here. I mean, let's just take an intentional affliction of emotional distress. There's a bucket case from New Jersey in 1988, and what it says is that the conduct must be, quote, so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. Your Honor, let me cite to the United States Supreme Court in Terry v. Ohio, no right – no right is held more sacred than the right to be free of the intrusions of just this type. This is the most sacred right in our nation. But I just – And it was invaded by these defendants. That is – Wait a minute. You lost me there. Intentional infliction of – to be free of intentional infliction of emotional distress is the most sacred right? No, to be free of false imprisonment, to be free of being seized without legal authority is the most sacred right. And that is the element – that is one of the things that occurred here to inflict that emotional distress. And furthermore, Your Honor, the IAED case that is cited is for an IAED, intentional infliction of emotional distress matter, that does not reach the facts of this case. Rather, we are looking at Buckley v. Trenton and Decker v. Princeton-Packett as we address this case with the physical impact. Where in your complaint did you allege that the emotional distress was severe? Or outrageous or atrocious or any of those? Outrageous. Outrageous under New Jersey law has to be outrageously severe. Your Honor, we don't plead conclusions. We plead facts. And the facts that are pledged state that he was tackled and handcuffed and held against his will. Within the brief, we cite the authority that that as a matter of law is and carries with it a presumption of extreme and outrageous – extreme emotional distress. Not under New Jersey law. That would not be considered an intentional – that would not – that would not under New Jersey law be considered that tort. It would be considered false imprisonment, battery, assault, but certainly not intentional infliction of mental distress. Okay. I don't have to hang my – or Mr. Mancotti does not have to hang his hat on that. Your Honor, it's the false imprisonment of battery. That's what I was, quite frankly, expecting you to argue. Because it seems to me by the shotgun approach, you've diminished what appear to me to be prima facie claims. I don't know if the facts will hold up. But you've alleged a battery. You've alleged a false imprisonment. Why are we dealing with all this other window dressing? I mean, it seems like a lot of these claims are tendentious at best. Well, tendentious – I'm not talking about the battery and false imprisonment. I'm talking about these negligent infliction of emotional distress itself. And we, at this stage, or even throughout this litigation, would be perfectly satisfied with battery and with false imprisonment and with breach of contract and conversion. And, in fact, those are the only claims that might be worth more than $75,000, right? Well, I would suggest – Because of the physical – you know, he's put away in a room for an hour. He's tackled. He's handcuffed. I would suggest that the false imprisonment and the battery have every availability of transcending the $75,000 threshold. If we agree with you, if we agree with you that assault, battery, false imprisonment transcends the $75,000, then what is the jurisdictional worth – what is the meaning of the $75,000 for diversity cases? The federal court is supposed to be a prior to limited jurisdiction. Then you're saying any time there's an assault and battery or false imprisonment, it's automatically, if there's diversity, a federal case. Is that right? No. First of all, it has to get here. But more importantly, I would suggest that a false imprisonment under today's authority – yes, any false imprisonment case that is proven as an intentional tort has every possibility of exceeding $75,000. So the $75,000 that Congress set up for diversity is really meaningless when any assault or battery or false imprisonment is automatically, if there's diversity between the parties, a federal case. If the parties so choose, yes. And, Your Honor, historically, any theft of a million dollars would have been a federal case. Or any – You don't have a theft here of a million dollars. No. Any time somebody intentionally derailed a train in a local area, that would have been – Let's stay with the facts of this case. You got someone that was properly – you played it properly. There's a question of fact as to assault, battery, false imprisonment, and public accommodation. That's the way I see your case. You don't have any medical proof of any damage, any emotional involvement, any expense that he incurred, just that he was shook up, and I can understand that. But does that reasonably mean that a jury could, without it being diminished by a judge for being excessive, have a $75,000 claim? Yes, Your Honor. And, again, that would be something that – it does get determined at trial as well. But, yes, $75,000 is not something that – Functionally, every false imprisonment today, if you can show any level of malice with it – surrounding Mr. Mancotti's situation, where he was taken to this situation – in that circumstance, an actual false imprisonment with handcuffs could not be denied federal jurisdiction under diversity in any state in this country, I would suggest. Yes. And I thank you for – I'll get you back on rebuttal. Do I have a – Five minutes for rebuttal. Five minutes? No, thank you. Is that correct, Roberto? Right. Mr. Donnelly. Thank you. May it please the Court, good morning. I would reserve, as well, with the Court's permission. No, you're on – I understand. You can go to full 15 or maybe more, but there's no rebuttal. I'll be less if I can. Thank you. Well, I'm in a happy position. I agree with everything the Court has said, all the questions. This Court – You agree when I said that he has a viable claim for battery and false imprisonment? I think he – It's worth more than $75,000, at least theoretically? No, that I don't agree with. I think that, number one, the contract claims and those claims related to the contract, such as the conversion claim and so on, are out because of the Campione case. Very clearly, I was – when the Court raised it, I looked at Campione, and the quote is, given the elaborate regulatory scheme, we likewise, we, the Supreme Court, declined to imply a cause of action when no such cause of action existed at common law, citing Miller, and that is settled law under Campione that there is no private cause of action for these kind of claims. This is a claim that arises under the gaming law and under the gaming rules in a number of cases. Let's go to the tort claims. Okay. The fiscal claims are 1, 2, and 4. Right. Battery, false imprisonment are 1 and 2. How can we say that we are legally certain, and that's the test, that his tort claims cannot exceed the statutory amount in controversy, the $75,000? For a number of reasons. Number one, I agree with Judge Cowen. If you were to say otherwise, all you would have to do in any case before the federal court is throw in some tort and point to some jury damages that have exceeded 75%. Well, you know, there's, in our investigation, and the other side has cited it, there's a complete number of cases in which seemingly minor things happen, or at least one might consider them to be minor in comparison to other types of torts, and yet there are far more than $75,000 awarded by juries. That, the juries do strange things, as we all know. So then we have to be legally certain that the jury here, if this gets to a jury, would not do strange things. I think that you cannot be bound by what some runaway juries have done in some cases. If you do, you're negating your jurisdiction, or you're going to pick up every minor case, because every person in the bar, and especially the card counter bar, that wants to allege some sort of claim to make what I think they're trying to do is make new law here to try to come up with some new cause of action, which is some tort-based cause of action based on very, very, very minimal. Well, what do you mean new law? He claims he was tackled, he was handcuffed. He was escorted out. He was embarrassed. That's not new law. This is common law, for God's sake. Well, it is common law that you cannot perform a battery, but under the facts that are pled, as you pointed out to my adversary, there's no allegation of any physical harm whatsoever, none, in the complaint. There's an allegation of emotional distress, and he dropped the unintentional and negligent. So the left is a claim for intentional infliction of emotional distress. But as the court must do, and as the district court found, it must look at the pleadings. Well, I agree personally. I don't know what the panel is going to decide. There's no claim here for intentional infliction. There's nothing severe here. But why can't a jury say that based on the false imprisonment, he was brought to a security place, he was embarrassed, the tackling. Also, I think the public accommodation claim was improperly dismissed because he claimed he returned and he wanted to speak to the people, and he claims he was not unruly, and they claim he was. That's a question of fact. So you have not only the assault and battery of false imprisonment, but you have the public accommodation claim. Why can't a jury say he was emotionally so distressed and shook up that it's $75,000? Well, first of all, with due respect, I disagree with the conclusion that he has a claim under those things. Why not? Why not? The public accommodation, he walked in. His claim is he wasn't unruly. They claim he was. Then the district court had a question of fact before it, and they threw out the public accommodation claim. I don't think so, Your Honor, and here's why. He pled. I counted them up. There were, in the complaint itself, he pled, I think, nine times that he was asked to leave the facility.  He says he was plain in the early morning hours. He doesn't say a time, but let's say it's 1 o'clock, 2 o'clock in the morning, early morning hours, maybe 3 o'clock. Who knows? He claims the card was dealt to him that he didn't like. He then says he protested that. No, he claims the card was dealt to him that he did like. That he did like. I'm sorry. You're right. He then says he protested that, and he uses the word protest throughout the complaint over and over and over again, including what he says in his own complaint is he protested to the dealer. Then he protested to Susie Floorperson. Then he protested more to Susie Floorperson. Then they told him to leave. He says in his complaint they asked him to leave. He didn't leave. He said, I want to go see the state authorities on premises, the CCC and the DG. They said, okay, but only if you agree to leave. Deal. They take him to see the Casino Control Commission DG. He files this complaint. Then they tell him to leave. Then he says in his pleadings he came back the same day later on after he'd been told to leave the facility. He never told him he couldn't come back. Well, Your Honor, if I come into this courthouse and somebody I protest because I don't want to be checked over and over and over again. People are told to leave Eagles games all the time, and that doesn't mean they can't come back next week for the next game. Perhaps next week. Or the next day. He came back the same day. When they sober up. The same day. He came back a few hours later the very same day. And one thing that we didn't. You're saying he didn't have the right to come back when you have a public accommodation there. He was evicted. He's a trespasser when he comes back. Well, that's the question. And if he's told he can't come back for a week, if he's told he can't come back for a month, he's banned for a year, whatever, then he can't come back. Are you telling me that he was in effect told he can't come back forever? I can't give you a time limit, but certainly one day violates that. That's a red flag. How do we know? It's a fact. It's a factual dispute. You might be right, but you might be wrong. Ten minutes? Was it ten minutes or ten hours that he could come back? He was told to leave. He came back the same day. And one thing I'd ask the court to take judicial notice of. It's not in our briefs. But three months earlier, a man by the name of Ray Cott had been murdered in the casino, a casino executive, by a disgruntled patron in a Trump-branded casino. Three months earlier, in May of 2009, a man walked into the casino who was a disgruntled patron and shot dead a casino executive by the name of Ray Cott. All that means is when man Cottie wanted to come back the next day, you had every right to frisk him or make sure he wasn't a threat, make sure he wasn't acting out or causing a disruption. I think your counterpart would agree that all that would be true. Well, he disagrees. He says we tackled him and we unduly held him and we handcuffed him. I think they would absolutely have a right to grab him. I disagree factually, but I know that's a factual thing. But to tackle him, to, quote, grab him, to go through to see if he was carrying a weapon or not, and to detain him for a time period to make sure that the situation was calmed down. How about when he returned back? How long was he excluded from coming back? Because he claims he came back sometime later. He claims he came back the very same day. Yes, but several hours after this incident. He doesn't say. He says a few hours. But he tries to – he sees it as a fact. Isn't it a question of fact when he returned, even though he was, let's say, properly excluded? Let's look at the facts on your side in the best light. Let's say he was properly excluded. Why? You're running a public accommodation. Why can't he return? Isn't it a question of fact whether he can then return several hours later? I think it's a question of law under these facts plan. The time period after someone protested, time after time after time. Could he come back the next day? I don't know. It depends on what the – but certainly not that day. Well, you're saying that he couldn't come – excuse me, sir. You're saying he couldn't come back. How long would that problem for him not being able to come back last? Once you're ejected, you should be ejected until you go through a process to get back on. You've been told to leave. You're out. To get back on, the process – there are processes there. You can't exclude someone from a public accommodation, sir. If they're disruptive, they're disorderly. But for how long? You can disrupt them. If they're disruptive, you can exclude them. But you can't exclude them forever. And isn't it a question of fact, if he returns several hours later, whether it was improper to say that – to throw him out at that point? If he had come back two weeks later, I would have a different argument. He came back the very same day, and they recognize it's a problem, so he pleads and he argues, I came back to see a casino manager. Well, isn't that an argument you should make to a jury and not to a panel of judges? Well, Your Honor, there are casino managers there. He came back under false pretenses. He didn't come back to see a casino manager. There's casino managers under the Casino Control Act present all day long, 24-7. He came back to, as we said in our briefs, to reignite this dispute. And he walked in, and just like security down below, as I came in, if they told me to leave or I'm up here being disruptive as maybe I'm being right now. Did he plead? Did he came back to reignite the dispute? He pleads, and he came back to have a discussion with a casino manager. All right. Well, then how can you say he came back to reignite the dispute? You're making arguments that I've heard made hundreds of times to – not hundreds, but many times to a jury. He had been evicted, and he had no right to come back in to reignite this dispute. If he wanted to follow the pursuit, he could follow the pursuit. He does not accept your premise that he came back to reignite. His pleading is he came back to talk to a different – he was hoping – he may have been casino manager shopping. He was hoping to find a more sympathetic ear with a different manager after the shift. Isn't that his version of the facts? I'm not saying they're true, but they're his version of the facts. That's what he says. I don't think – and I think as a matter of law, when you are ejected from a facility, you certainly can't come back a few hours later, especially after you've had – and I did find the part of the complaint. It's six times he was asked to leave. I'm with you on the initial ejectment. That's fine. I just think it's a tougher question when he's coming back. Let me turn for a minute back to – let me turn to Battery and false imprisonment. Let's say the jury awards Mankati $5,000 on the Battery and $7,500 on the false imprisonment. Is that a problem? You mean $75,000? $7,500. $5,000 on the Battery, $7,500 on the false imprisonment. Well, he doesn't have jurisdiction here. No, I'm saying is that a runaway jury? Is that a – you know.  Is that a problem under New Jersey law? I absolutely think – A jury couldn't possibly award him $5,000 or $100 in compensatory damage. I think a jury – if the judges didn't act as a gatekeeper, I think a jury could do a lot of different things. I think it would be remitted under these circumstances. He had – the judge below, Your Honor, offered him a chance to add to – he gave him an opportunity to file supplemental papers to show any damages. He sent in supplemental papers to show that he had scraped – had a scraped knee and some form of rash. Well, that's why he threw small numbers at you. I mean, he may win a small amount of compensatory damages on both tort claims, correct? He could and maybe – And under New Jersey law, punitive damages are available for Battery and punitive damages are available for false imprisonment, are they not? For outrageous behavior. And that's a jury question. Yeah. Well, just for a simple false imprisonment and assault of Battery, it doesn't have to be outrageous. Punitive damages are available. But you have justification here, which – Well, he's pled that there's justification. He was improperly tackled, embarrassed. Would that give rise to punitive damages? I don't think any judge would allow that. After – when we put before the jury that a man had been murdered three months earlier in a sister casino – Yeah, but there's no claim here to this fact yet. Okay. Do you really think a judge is going to let that into evidence? Absolutely. It's not unduly prejudicial? A guy who's dealt an ace and gets in a snit about it is going to be compared to a murderer? No, because what the trial would turn on, I'm certain, on the Battery, they'd say no justification and how could anyone – first of all, I don't believe he was tackled. But how could anyone treat me this way? Well, what were people's – he talks about expectations of winning on the – what was going through the casino guard's mind? They'd thrown him out a few hours earlier. He comes back in. They know a guy just got killed three months earlier. What would we have them do? Say, oh, I'm sorry, Mr. McCoy, we've asked you to leave six times before. You've agreed twice to leave, and now you come back. What do you do? Let me just ask you, and I will concede at the outset, that the issues relating to how the game is played is in a venue other than before us. But let me – just for my own edification, if you're in a hand and you have a deck and you're dealt an ace, what gives the casino the right to come and, in effect, reshuffle, in effect changing the game? It's – the rules say they cannot do that, and they violated the rule and they were fined for it by the Casino Control Commission. But the rules – So you can – so then you can imagine how somebody like Mr. Mancotti or Mancotti, whatever his name is – is it Mancotti or Mancotti? Mancotti. Mancotti. You can imagine how somebody like Mr. Mancotti, who knows the rules as well, gets a little upset. Precisely. Precisely. And that's why when he came back three hours later after being told he was gone, I – if I were a guard, I think any rational person in this room would say, this guy is coming back to cause trouble. He was put out. He is allowed to make his complaint. He left finally, and he's out. Now he's – why is he steaming back in here? Well, he claims he came back – he claims he came back put together and he was in order. He claimed – that's his position. Your position differs. Don't we have a factual issue as to whether or not when he returned, whether he was a trespasser or an invitee? Well, Your Honor, yes, there is a factual issue there. My argument was below in here, this should not be in federal court. If he had these claims, if he wasn't – if this didn't have this card counter gloss to try to change the law that the card counters don't want, they wouldn't have brought it here. They don't – Well, I'd like to hear you sum up on why you think that there's no – that it's a legal certainty. A legal certainty is, Judge Ambrose indicated, that this case could in no way yield $7,500. $75,000. Number one, he pled no physical damages at all. His only damages he has pled. Over and over and over and over again, he says his damages are cheating, and that's the contract claim, which is out because of the state law. So the other damages have is this, you know, 12, 10 torts, a mishmash of torts, all of which there are no physical damages. There is the pleads emotional negligence and emotional distress. But he has no physical damages except a scraped knee. And I believe that – I believe as a matter of law that when someone is put out – I believe he was a trespasser. He was evicted, and we could argue whether he could come back in two months or three months, but I firmly believe he can't come back that day, especially under these circumstances, all this process. Then once he comes back in, we have the right as security, we have the duty to do something to make sure this man has not come back in to cause harm to us or others. And what they did there was, even as pled, I think reasonable. They say they tackled him. Now, what's so horrible about that? Whatever it was, it caused a scraped knee. The point is what you're saying, that's a very good argument, but it's a good argument to a jury. Well, I come back where I started, Your Honor. This case has no business being in the federal courts. If this kind of case gets in – if he were before the state court raising these issues, maybe I would end up in a jury. Maybe I would. I don't think I'd lose it because – given all these circumstances. But this isn't about his – about false imprisons for about an hour. This is about trying to change the rules for card counters. And I suspect the reason they dropped the Houston claim on this appeal is to try to remove that element from the case. But that's what this case is about. You don't bring in lawyers from Nevada and fight these cases and take appeals to the Third Circuit over a scraped knee. That might be the backstory, but they've pleaded these other torts. So we have to – on a motion to dismiss, the courts have to deal with what was pleaded. I know, Your Honor. I agree with that. But my point is, and I echo what Judge Collins said, if that's all the hurdle is, I'm going to be before the federal court every time I want to be. It's a very – I mean, it is a remarkably low threshold. I'm not saying you won't win in the end, but in terms of getting into federal court for diversity purposes, I mean, the cases – do you know of any case where a court has said that battery and false imprisonment cannot to a legal certainty be up to $75,000 in controversy? I don't know that I – most of these cases where courts would do that are not going to be published. So the answer is no. No, but I mean, I just – we found a number of cases from district courts and state courts and also the Sixth Circuit that all go the other way. I mean, it's – you can step across this threshold. You don't have to jump. But, Your Honor, I think you have to read it against what he pled in the complaint and the circumstances. You can't just say any case is $75,000. I have to say this was a badly pleaded complaint. I mean, it's pretty comprehensive. It's 13 counts. It is comprehensive, but remember the behavior. Asked to leave, told to leave, wouldn't leave, complained to the authorities, told to put in a writing by the authorities, he criticizes the authorities, then finally leaves and comes back a few hours later. Under those circumstances, I say it again, the casino – imagine if he had come back with a gun and shot somebody. Well, usually if he came back, I assume that security checked him out, right? When he came back, security – he caught security by surprise. They evicted him. All of a sudden, he's coming back in. What goes through your brain? Why the heck is this guy coming back? It's not – Well, as it turns out – back to Judge Hardiman's question. As it turns out, he didn't have a gun. It turned out he didn't have a gun. And he wanted to just – he wanted to find another person to make his complaint. If he went to the casino shop, a manger, there's things called telephones. He picks it up and calls the casino manger on the phone or writes a letter. We don't know if he tried or not. We never got that far. Well, he came back in. He was a trespasser. He's returning. He was perceived as a danger, appropriately so. If the guards had not acted that way and he had had a gun or any other weapon, then we'd be in a much bigger suit if some patron got hurt because they'd be saying, why didn't your guards stop him and detain him? All right. Thank you very much. Thank you, Your Honor. Mr. Mercisi. Thank you. Just a few things. He complained. He complained and protested and protested six times. If you look at the complaint, three of those are the same ones just repeated in a different one. What he did is he said to the dealer, you can't do that. He was right. He said to the floor person, you're telling her to do something she can't do. He was right. Up comes, and how do we know he was right? To quote the defendant's attorney, the rules say they can't do what they did. He just said that right here. Let's assume for the moment, just assume that we agree that there's an amount in controversy here that meets the threshold. Do we get to the merits or do we remand? Do you get to the merits? I think right now you remand because, honest to goodness, nothing in the district court has been fleshed out. You've heard here lawyers arguing against lawyers about what this question of fact is, the court addressing whether there's questions of fact or aren't these questions of fact. Don't we need some facts before any of this can be done on a dismissal basis? Yes, there are questions of fact all over the place, so it would be remand for further proceedings in accord with the pleadings. Why isn't that true only with respect to the claims where there are disputes of fact? Why can't we throw out the claims that are non-starters from a pleading standpoint? Can't we do that on a motion to dismiss the same way the district court would and say, look, you haven't pleaded an IED claim. You've already given up, I think, appropriately on the Austin or Houston claim. Well, Your Honors, you can pretty much do that if you think that we didn't plead it. I believe the complaint and the underlying facts pled in the complaint do support each of those causes of action. And the courts have recognized that as a case goes on, especially with discovery, et cetera, the various complexities and ways that things develop, not undeveloped, but develop, show that some of these cases of action that are being contemplated for dismissal today may end up under the facts being the lead authorities. We can't get into, we haven't seen yet, what we can expect to see through discovery. For example, if you haven't pleaded, I mean, premises liability. What did you plead on? I mean, the carpet didn't trip him. I mean, he didn't get scraped because of the carpet. I'm sorry. The strength that strikes me, speaking only for myself, of your battery claim, completely undermines your premises liability claim. You know, they laid hands on him. They tackled him. They handcuffed him, et cetera. It wasn't the premises. It wasn't the lighting or the carpet or the staircase that he fell down. The duty for premises liability is to assure that the patron or the prospective plaintiff is protected from harm, and New Jersey says that we read in some of what their status is and then reach the level of the duty. The question of whether that harm befalls him because of a policy that says you're tackled or that harm befalls him because of a fold in the carpet does not alter the fact of liability for premises liability. In fact, yes, many claims overlap today, especially with reference to tort. And I guess the big question, let me put it to you in a more sort of colloquial way. Assume for the sake of argument we reverse in some part and send this back down. Shouldn't we clean it up? So everyone's, thank you. I understand what you're saying. You took the phrase right out of my mouth. No. For the benefit of both sides, for the benefit of the district court, shouldn't we clean it up? I understand exactly what you're saying, and the adversarial process through trial and through discovery is what has been developed once the pleadings are joined to clean things up, not judicial fiat with all deference to your honor. We have to satisfy the pleading threshold. And if we didn't, then yes, you are certainly at liberty to remand with those surviving. I would like to point out before I run out of time, Campione said that when no such cause of action existed at common law, then it is exclusive to the casino control commission. That's the holding. We sue for breach of contract. We've shown where there was a contract. We also sue for conversion. Those are common law claims. In Campione, they were dealing with, if I remember right, preferential shuffling. Yeah, but that all revolves around they're stopping the game. It's part of the casino control commission. Look, you've got a good claim for the battery, the false imprisonment, and the public accommodations. Aside from those three, you haven't pledged sufficient facts for the intentional infliction or the other kitchen sink that you threw in here. Why shouldn't we, if we send it back at all, send it back on those three issues and clean it up and let it go that way if we think that you've made a $75 claim? Your Honor, if it's going to be cleaned up and sent back, then throw out the conversion claim. Throw it? For what? Then find the conversion claim on the take and ace. But what we do have on the take and ace... That claim is part of their improperly stopping the game. But if I might, the improperly stopping the game is breaching the contract at common law, not under the regulations. It's exclusive of the regulations. And Campione says even when you reach this regulatory area... But the problem you have there is, let's just, again, assume for the moment without any thought one way or the other that you're right. Let's assume you're right. The most he can get out of that is how much? $1,866 on a contract claim. Yes, and it aggregates with the others, but why is that important? Well, to get to jurisdiction, you need to get another $73,200, right? And I think if the district court decision is purely a jurisdictional question, and I do have some confusion reading the decision, but if it is purely on a jurisdictional basis, we are there on the false imprisonment, and the rest of the decision doesn't really apply because we get there on false imprisonment and should be remanded in total. But if there is a propensity to clean up, I just want... I am trying to highlight that Campione also says that once it's referred to the casino control commission, then the courts are free to address it, and Campione even suggests staying it while that occurs. And then the common law claim can be addressed. In this case, it's already been there. The defendant already said so right here and has said so in their pleadings, and they were fined $5,000. Now the common law claim exists. Are there any further questions? And I thank you all so much for your time. No, thank you. Thank you, both counsel, for a well-presented case. We'll take the matter under advisement.